# EXHIBIT "2"

Dockets.Justia.com

```
1                    CAUSE NO. 06-H-0395-C

2   AUBREY CLARK AND WIFE,      ) IN THE DISTRICT COURT OF

3   KELLY CLARK                 )

4   VS.                         ) MATAGORDA COUNTY, TEXAS

5   KELLOGG BROWN & ROOT, LLC   )

6   AND HALLIBURTON COMPANY     ) 23RD JUDICIAL DISTRICT

7

8   * * * * * * * * * * * * * * * * * * * * * * * * *

9                      ORAL DEPOSITION OF

10                    GEORGE D. McGINNIS

11                      March 27, 2007

12  * * * * * * * * * * * * * * * * * * * * * * * * *
```

ORAL DEPOSITION OF GEORGE D. McGINNIS, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on March 27, 2007, from 1:53 p.m. to 3:39 p.m., before Holly Giffin, CSR, RPR-RMR-CRR, CSR No. 2792, in and for the State of Texas, reported by machine shorthand, at the offices of Provost * Umphrey; 490 Park Street; Beaumont, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



PLAINTIFF'S EXHIBIT

NMA COPY

```
 1   deposition.
 2        A.   Yeah.
 3        Q.   Because you actually worked with Brown & Root
 4   a little earlier than the 1970's; but as far as your
 5   offshore work, that is probably right; is that correct?
 6        A.   Well, I went out there before '70 -- does it
 7   say "1972" exactly?
 8        Q.   Actually it says (READING:) I began my work
 9   with Brown & Root in the early Seventies.
10        A.   I went out there probably in '67 or '68, you
11   know, and then came back.
12        Q.   And I'm not fussing with you.  I'm just saying
13   this is what I was shown.  I'm just trying to clarify.
14   That's kind of why we are here.
15             In the next sentence it says (READING:) I
16   later became a welder and eventually a welder foreman,
17   which we have already talked about.
18             And it says (READING:) During my
19   employment with Brown & Root, I, along with Aubrey
20   Clark, were crew members on the GEORGE R. BROWN, FOSTER
21   PARKER, the OCEAN BUILDER 1, and SARITA offshore
22   barges.
23        A.   (Witness moving head up and down)
24        Q.   Just so you're looking at it and make sure it
25   says that (tendering).
```

1           And we've identified those barges earlier
2  in this deposition?
3       A.   The SARITA is another ship, self-propelled.
4       Q.   So, even though it says "OCEAN BUILDER 1 and
5  'SERITA' offshore barges," your testimony is that the
6  OCEAN BUILDER 1 and the SARITA are self-propelled
7  vessels; they're not barges?
8       A.   Right.
9       Q.   But the statement about the GEORGE R. BROWN
10 and the FOSTER PARKER being offshore barges is correct?
11      A.   Right.
12      Q.   Taking into account what you said in your
13 affidavit and what we talked about in this deposition,
14 fair to say the GEORGE R. BROWN, FOSTER PARKER, OCEAN
15 BUILDER 1, and SARITA offshore -- SARITA vessels -- are
16 the -- let me ask that again. I'll start over.
17           The places where you've worked with
18 Aubrey Clark while you were employed by Brown & Root
19 were the GEORGE R. BROWN and FOSTER PARKER barges --
20      A.   Uh-huh.
21      Q.   -- is that right?
22      A.   (Witness moving head up and down)
23      Q.   Right?
24      A.   Right, right. I'm sorry.
25      Q.   And also the OCEAN BUILDER 1 and the SARITA

```
 1  vessels?
 2       A.   Yes.
 3       Q.   Can you recall any other barge or vessel where
 4  you would have worked with Mr. Clark?
 5       A.   No, I can't.
 6       Q.   And just so it's clear, we've gone through
 7  your work history; and I think the only barge that
 8  we've talked about that you worked on where Mr. Clark
 9  would not have been would have been the H.A. LINDSEY?
10       A.   He's worked on there, too.
11       Q.   I understand --
12       A.   Not for a long time.  Like I say, they tie
13  Mr. Jones' barge up.  And he will come over and work
14  with us, or maybe he's going to stay and work on the
15  barge in the yard.
16            They try to keep you busy, you know.  I
17  was never laid off, you know.  Brown & Root is
18  notorious for giving people ROF's, but we worked for
19  all those years and never got an ROF.
20       Q.   I appreciate all that, but I'm trying to find
21  out if he worked on the H.A. LINDSEY.  That's not in
22  your affidavit.  I'm trying to find out if that's your
23  testimony.
24       A.   He might could have worked there for a month.
25  We all worked together on all of them at one time or
```

1  another.  Let's put it like that.
2      Q.    How about when you went to Mexico for that
3  two-year period?
4      A.    He was not down in Mexico.
5      Q.    So, if you would have worked with Mr. Clark on
6  the H.A. LINDSEY, it would have been somewhere in the
7  Gulf Coast area?
8           MR. JONES:  Form.
9      A.    Yeah.
10     Q.    (BY MR. MARTINGANO) So, if we add the LINDSEY
11 to this list of barges and ships, have we covered all
12 the places where you could have worked with Mr. Clark
13 for Brown & Root offshore?
14          MR. JONES:  Form.
15     A.    I think so.
16     Q.    (BY MR. MARTINGANO) Now, it's probably not
17 possible for me to ask you specifically.
18          Do you remember working with Mr. Clark on
19 the FOSTER PARKER in 1976?
20     A.    Yeah, because I think the LINDSEY was in
21 California then.
22     Q.    I was trying to make things easier.  Maybe it
23 is just easier if I ask you these questions.
24     A.    And I went to the FOSTER PARKER.  The H.A.
25 LINDSEY went out there right in there somewhere, and I

1  think that's about when it was -- '76, somewhere right
2  in there.  And I worked on the FOSTER PARKER at that
3  time.
4      Q.   Let me start with the GEORGE R. BROWN.
5           Do you remember working with Mr. Clark on
6  the GEORGE R. BROWN?
7      A.   I do.  That's the first place I saw Mr. Clark.
8      Q.   When you first saw him, do you remember what
9  year that would have been?
10     A.   No.  Early Seventies.
11     Q.   And what do you recall Mr. Clark did on the
12 GEORGE R. BROWN when you were there?
13     A.   The first I saw him, he was probably a
14 rigger's helper.
15     Q.   And what does a rigger's helper do?
16     A.   That is what -- all new-hires come out there
17 as a rigger's helper or if you're going to work on a
18 deck.  They've got engine room; and they start them out
19 as oilers, but he worked on the deck and, I'm almost
20 positive, a rigger's helper.
21     Q.   And what does a rigger's helper do?
22     A.   Same thing as a rigger.  It is just an excuse
23 not to pay them a lot of money.
24     Q.   Besides the title, was the function they
25 perform generally helping rig up the cranes to make

1  sure --
2      A.   Right.  Hooking up chokers, painting,
3  sandblasting.  A rigger was a jack-of-all-trades.
4  Everything that went on on the deck, they had a hand in
5  it.
6      Q.   How long did he work as a rigger's helper?
7      A.   Not long because he learned fast.
8      Q.   What did he graduate to?
9      A.   A rigger.
10     Q.   How long did he stay as a rigger?
11     A.   I don't know.
12     Q.   Do you recall Mr. Clark doing any other job,
13 besides rigger, when you were working aboard the GEORGE
14 R. BROWN?
15     A.   No.  He was never a crane operator.  I don't
16 know how long it was before he made lead-off man.  That
17 is the go-between between the foreman and the riggers.
18     Q.   And while you were on the GEORGE R. BROWN
19 during that period of time, you were working as a
20 welder?
21     A.   Yes.
22     Q.   Now, on the GEORGE R. BROWN do welders work in
23 the same place or different?
24     A.   Same place.
25     Q.   And that's all on the deck?

```
 1    A.   Deck or on the platform.
 2    Q.   And that's the platform that you're
 3  installing?
 4    A.   Right.  There is a gangplank that runs from
 5  the deck of the derrick barge to the platform.
 6    Q.   And the work you are doing on the deck or the
 7  platform, that's outdoor work?
 8    A.   Yes.
 9    Q.   So, you are subject to the elements:  the
10  wind, the sea, and all that stuff?
11    A.   Uh-huh.
12    Q.   Is that "yes"?
13    A.   Yes.
14    Q.   All right.  Your affidavit says that
15  (READING:) While working for Brown & Root with Aubrey
16  Clark in the Seventies, we used benzene to clean our
17  hands, tools, gloves, clothing, and equipment.  We were
18  provided the benzene by the Brown & Root; and the
19  benzene was in barrel racks on the barge.  We used the
20  benzene on a routine daily basis for several years.  At
21  no time were we given any warnings that benzene was
22  dangerous and were not given any instructions to wear
23  respirators or protective equipment when using benzene.
24          Have I accurately read through your
25  affidavit (tendering)?
```

1  A.  Yes, sir.
2  Q.  First question I want to ask you about your
3  affidavit is:  When you make the statement (READING:)
4  While working for Brown & Root with Aubrey Clark in the
5  Seventies, we used benzene to clean our hands, tools,
6  gloves, clothing, and equipment, tell me how you know
7  that the substance that you guys were using to clean
8  your tools, hands, gloves, clothing, and equipment was
9  a substance called "benzene"?
10  A.  It was talked about.  You know, seemed like --
11  I'm pretty sure it was stenciled on the barrel in white
12  letters -- big white letters, but that's all I could
13  tell you about it.
14  Q.  What color were these barrels?
15  A.  I can't say.
16  Q.  Did you see anything else on the barrel
17  besides the stenciling?
18  A.  No.
19  Q.  No --
20  A.  I tried to think who the manufacturer of it
21  was, but I can't put a handle on who manufactured it.
22  I know we used an awful lot of Shell products.  When
23  those oil companies come on your vessel, they like to
24  see their products stacked around.
25  Q.  Did you see any kind of placard or one of

1    A.    Yes.

2    Q.    (BY MR. MARTINGANO) All right.  In your
3 affidavit it says that (READING:) We routinely departed
4 from Matagorda, Texas; Orange, Texas; Galveston, Texas;
5 Port Aransas, Texas; Freeport, Texas; Morgan City,
6 Louisiana; Grand Isle, Louisiana; Venice, Louisiana for
7 our work on the barge (tendering).

8    Can you review your affidavit and make
9 sure I said that right?

10    A.    (Examining) I don't recall leaving from
11 Matagorda.  We left from Port O'Connor lots of times,
12 but not, per se, Matagorda.  I think --

13    Q.    And I was going to ask you that because I
14 didn't know if Matagorda had a port that you guys could
15 leave from.

16    A.    We left from Port O'Connor.

17    MR. JONES:  It's marked "Matagorda
18 County," isn't it?

19    THE WITNESS:  I think it is.

20    Q.    (BY MR. MARTINGANO) Just so it's clear, when
21 it says you left out of Matagorda, that's inaccurate.
22 It should say that you left out of Port O'Connor?

23    A.    Port O'Connor.  Port Aransas, we left there a
24 lot of times because the ships -- that's the only place
25 they could tie up.

1  Q. That's because the barges and ships, were they
2  too big to go into the other places?
3  A. The ship is too big. And they have to hire a
4  pilot to go to Houston, and that's expensive.
5  Q. Did you ever do any work on the barges or
6  vessels inside of Matagorda Bay?
7  A. No. They can't work in there. It's too
8  shallow.
9  Q. Tell me how it was arranged for you guys to
10 get from the shore to the barges.
11 A. Crew boat or work boat every -- not very
12 often. For some reason, a crew boat would be broke
13 down; and they would send a big work boat to get us.
14 Q. What is the difference between a crew boat and
15 a work boat?
16 A. A crew boat is a lot faster, probably twice as
17 fast; and a work boat, probably about 20 people can sit
18 down. The rest of them have has to lay and stand and
19 everything. And there is a lot of seats on the crew
20 boat.
21 Q. Of those locations where you routinely
22 departed from, that you mentioned in your affidavit,
23 was there any one place that you left from more
24 frequently than the others?
25 A. No, I wouldn't say so. We left probably all

```
 1   the way from Venice to Port Aransas.  And I worked -- I
 2   forgot to tell you about that -- in North Carolina, on
 3   the H.A. LINDSEY once.  We went over there and did some
 4   work for the Navy.
 5       Q.   It sounds like the LINDSEY did a lot of
 6   mileage.
 7       A.   Yeah.
 8       Q.   And the other boats kind of stayed in the
 9   Gulf?
10       A.   Most of the time.
11       Q.   All right.  So, in terms of -- if I'm
12   understanding your testimony correctly, the different
13   places that you guys departed from to go leave shore to
14   go to the barges that were located offshore, you
15   mentioned several different locations in Texas and
16   Louisiana; and based upon your recollection, you went
17   out of those places.
18            You're unable to tell us which one you
19   went out more often than the other?
20       A.   (Witness shaking head from side to side)
21       Q.   Is that correct?
22       A.   I know one time we worked out of Galveston for
23   nearly a year.
24       Q.   But is it correct to say that of the different
25   ports that you departed from, you cannot tell me that
```

```
 1                CAUSE NO. 06-H-0395-C
 2   AUBREY CLARK AND WIFE,    ) IN THE DISTRICT COURT OF
 3   KELLY CLARK               )
 4   VS.                       ) MATAGORDA COUNTY, TEXAS
 5   KELLOGG BROWN & ROOT, LLC )
 6   AND HALLIBURTON COMPANY   ) 23RD JUDICIAL DISTRICT
 7                    REPORTER'S CERTIFICATION
 8              DEPOSITION OF GEORGE D. McGINNIS
 9                        March 27, 2007
10        I, HOLLY GIFFIN, CSR, RPR-RMR, Certified Shorthand
11   Reporter in and for the State of Texas, hereby certify
12   to the following:
13        That the witness, GEORGE D. McGINNIS, was duly
14   sworn by the officer and that the transcript of the
15   oral deposition is a true record of the testimony given
16   by the witness;
17        That examination and signature of the witness to
18   the deposition transcript was waived by the witness and
19   agreement of the parties at the time of the deposition;
20        That the original deposition was delivered to
21   MR. MARTINGANO;
22        That the amount of time used by each party at the
23   deposition is as follows:
24        MR. MARTINGANO -   1 HOUR, 26 MINUTES
25        MR. JONES       -   16 MINUTES
```

1  That $641.20 is the deposition officer's
2  charge to the DEFENDANTS for preparing the original
3  deposition transcript and any copies of exhibits.
4  That pursuant to information given to the
5  deposition officer at the time said testimony was
6  taken, the following includes all parties of record:
7  FOR THE PLAINTIFF, MR. ZONA JONES
8  FOR THE DEFENDANTS KELLOGG, BROWN & ROOT, L.L.C.
9  AND HALLIBURTON COMPANY, MR. JAMES G. MARTINGANO
10  That a copy of this certificate was served on all
11  parties shown herein on the 2nd day of
12  March, 2007, and filed with the Clerk
13  pursuant to Rule 203.3.
14  I further certify that I am neither counsel for,
15  related to, nor employed by any of the parties or
16  attorneys in the action in which this proceeding was
17  taken, and further that I am not financially or
18  otherwise interested in the outcome of the action.
19  Certified to by me this 2nd day of
20  March, 2007.

NELL McCALLUM & ASSOCIATES   409-838-0333
HOLLY GIFFIN, CSR, RPR-RMR-CRR

1
2
3
4  _____
   HOLLY GIFFIN, CSR, RPR-RMR-CRR
5  Texas CSR No. 2792
   Expiration Date: December 31, 2007
6  Nell McCallum & Associates, Inc.
   Firm Registration No. 143
7  2615 Calder Avenue, Suite 111
   Beaumont, Texas 77702
8  (409) 838-0333/(409) 832-4501 (fax)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25